Hawkins, J.,
delivered the opinion of the Court, adopting the opinion previously prepared by Judge Aroh. Wright, one of the former Judges of this Court.
This is a writ of error, sued out to this Court by Kirkman & Luke, to reverse a decree pronounced by the Chancery Court at Clarksville.
On the 18th of November, 1856, .the members of the firm of W. E. Newell & Co., conveyed in trust, for *398 the payment of their debts, a large amount of individual and firm property. A leading object of the deed appears to have been, “to secure the firms of Newell, Irvin & Co., and Gentry, Green & Co., in all cases where they, or either of them, were liable for the debts of the grantors, either as endorsers, or otherwise. Kirkman & Luke resided in St; Louis, W. E. Newell & Co., in Montgomery County, Tennessee. The former were the Commission Merchants of the latter, who were manufacturers of iron at their Works, and had become indebted to the former in a large sum, for accommodation, acceptances, etc., made and paid for them without funds — the iron placed in their hands being insufficient to meet the balance.
In this state of things, Kirkman & Luke became uneasy as to the security of their debt, and one of the firm visited Tennessee, and required W. E; Newell & Co. to execute a mortgage, which was declined, as it might affect the credit of the firm; but they offered, (rather than be sued, and for the sake of indulgence,) to give personal security, and to go to St. Louis to make a satisfactory arrangement; and W. E. Newell, one of the firm, did afterwards visit that city, where it was agreed between the two firms, that W. E. Newell & Co. should continue to do business with Kirkman & Luke, who should give them a standing credit of at least $20,000; and that, in order to secure Kirkman & Luke from any loss, as well in regard to the existing indebtedness, as to future acceptances, advances, etc., they should deposit with them, as collateral security, their notes, well indorsed, to the amount of $20,000, *399 and which, when W. E. Newell returned to Tennessee, he was to have executed, and transmitted by mail to Kirkman & Luke. The firm of W. E. Newell & Co., upon the return of W. E. Newell, did accordingly make their four notes, of five thousand dollars each, payable at the Bank of Missouri, in St. Louis; two dated the 18th of September, and two dated the first of October, 1856; all due the 1st of January, 1858, and all indorsed by Newell, Irvin & Co., (who were the payees) — two indorsed by Gentry, Green & Co., and one by H. H. Hol-lister — and transmitted them by mail, in the usual way, through the post office at Clarksville, Tennessee, to Kirkman & Luke, St.'Louis, three of which were received and accepted by Kirkman & Luke as satisfactory; but the fourth note, which was only indorsed by Newell, Irvin & Co., failed to come to hand, and was lost in the mail. Two of the notes were sent by one mail, and the other two at different times, shortly after their dates — the last note mailed being the one which miscarried.
After this arrangement, W. E. Newell & Co. continued to draw upon Kirkman & Luke, as they had done before; and the latter accepted their bills to a very large amount, trusting to the personal security. Among the bills so drawn and accepted, were two now held by Thomas Kirkman, (not of the firm of Kirkman & Luke,) for $5,000 each, dated the 25th and 30th of October, 1856, and indorsed by Newell, Irvin & . Co. Kirkman & Luke paid all of their acceptances for W. E. Newell & Co., except these two bills; and, including them, the balance due Kirkman & Luke, by W. E. *400 Newell & Co., Sifter giving them all proper credits, was found to he, $25,711.89, and for which they are without funds, save the collateral notes. Newell, Irvin & Co. are now insolvent, and have paid nothing either to Thomas Kirkman, or to Kirkman & Luke. W. E. Newell & Co., are also insolvent, and the assets embraced by the assignment are insufficient to pay the debts. When the four collateral notes matured, Kirk-man & Luke caused payment thereof to be demanded, which, being refused, they were protested, and the in-dorsers duly notified, a duplicate being used instead of the last note.
The Chancellor decided that' Kirkman & Luke were not entitled to charge the last note upon the trust fund, assuming that they were not aware, before the making of the assignment, of its having been mailed to them, and' had not received or accepted it. The Chancellor further decided, that, the two bills held by Thomas Kirkman should be charged upon the trust fund; and that notwithstanding the balance due to Kirkman & Luke, from W. E. Newell & Co., and their liability for them, as already stated, yet, by a construction of the deed of trust, Kirkman & Luke were not entitled to charge the trust fund with the whole of the remaining three notes, until they should pay the debt so due to Thomas Kirkman; and that they should, in fact, be permitted to receive their share of the trust fund upon only one of said notes. .
We do not understand how this decree is to be supported. It is, in effect, conceded, and, we think properly so, that the three notes which came to hand, were *401 received and accepted by Kirkman & Luke, before the execution of the deed of assignment. As it respects the fourth note, which' was lost in the mail, it is certainly true that it is essential to the legal operation of a deed, or other writing, • that the grantee, payee, etc., assent to receive it, and that it can have no binding effect without an acceptance: Jackson, Ex. Dem., Eames vs. Phippy, 12 Johns. R., 418, 422.' Inasmuch, therefore, as it appears to us, from the evidence, that no particular indorsers were agreed upon by the parties, and that it was not left exclusively to W. E. Newell & 'Co. to select them, irrespective of the assent '■or concurrence of Kirkman & Luke, if nothing else had occurred beyond the simple drawing and mailing of the note, it might, perhaps, be a matter of debate, whether the transaction had effect. But the case does not stop here, for the proof shows that at some time or other, before the maturity of the note, Kirkman & Luke had become aware that it had been mailed to them, and being lost, that they possessed themselves of a duplicate, and took steps to collect the note, by causing a demand of payment thereof to be made, and upon its dishonor, had the indorsers duly notified; and now, in their bill and answer, claim the benefit of this, "with the other three notes, as a security for the indebtedness of W. E. Newell & Co. to them, and also of their liability for them; so tlrat we are satisfied that Kirkman & Luke did assent to receive this note as a security. But whether this was before or after the assignment of W. E. Newell & Co., the record does not very satisfactorily disclose. But suppose it was after — a supposition hardly reconcilable with *402 the facts of the case, when we consider the time which had intervened — the previous agreement that the notes should' he forwarded, and that must necessarily have been communicated in the various letters between the parties — what effect is to he given to the transaction?
Mr. Greenleaf, in his work on Evidence, (2 Greenl. Ev., sec. 297,) speaking of the delivery of deeds, says: “The delivery of a deed is complete, when the grantor or obligor has parted with his 'dominion over it, with intent that it shall pass to the grantee or obligee; provided the latter assents to it, either by himself or his agents.” It follows, therefore, that no form of words is necessary, if the act is done; and that the delivery may be complete without the presence of the other party, or any knowledge of the fact by him, at the time, if it be made to his previously constituted agent; or if, being made to a stranger, the transaction is subsequently ratified. If the effect of the interest is beneficial to the party to whom it is made, as, for example, if it be an absolute conveyance of land in fee simple, or an assignment to pay a debt, his assent to it will he presumed. And the possession of a deed by the grantee or obligee, is, in the absence ©f opposing circumstances, prima facie evidence of delivery. In a note to the section, it is said, upon the authority of Wheelwright vs. Wheelwright, 2 Mass., 447, though the grantor die before the deed reaches the hands of the grantee, it is still a good delivery; and upon Doe vs. Kight, 5 B. & C., 671, it is not necessary that the delivery be made to an agent of the grantee or obligee. In Buggies vs. Lawson et al., *403 13 Johns. Rep., 285, it is held that where a deed is delivered as an escrow, or apon a condition, and either of the parties die before the condition is performed, the deed is valid, and takes effect from the first delivery, and afterwards the condition is performed. In a case of our own, Goodwin et al. vs. Carroll, 2 Hum., 490, it is held, if a deed he delivered to a stranger for the nse of the obligee, and he afterwards receive-it, it is good for the time of the delivery to the stranger, even though there be no evidence of its acceptance until the time of the plea; and that the commencement of the suit on the bond, and the production of it in Court by the attorneys of the plaintiff, is sufficient evidence, prima facie, of his acceptance. These are cases of sealed instruments; but the doctrine applies as strongly to writings unsealed. In Dargan vs. Richardson, 1 Cheves’ Law and Equity Reports, 197, it is held, that an assignment, by letter,, of goods, to indemnify one who has paid money as security, was good against creditors attaching before the letter was received, or the assignment accepted, and took effect from its date. The case was this: The plaintiff, as security of one Long, had paid money on his account. Long being about to leave the State, addressed a letter to the plaintiff, making an assignment to him of all his goods, as an indemnity. After the date of this letter, but before it reached the plaintiff, attachments had been levied, under which the goods were afterwards sold by the defendant, as Sheriff. The action was to recover the sum the plaintiff had paid, out of the proceeds of the sale. The Court *404 below thought, as the letter was not a deed, but a parol assignment, it was good, and took effect from its date, and decreed for the plaintiff. The defendant appealed, on the ground that the letter conveyed no interest to the plaintiff, till it was delivered and accepted by him. The Court of Appeals affirmed the decree, and among other things, said: “It seems to be admitted, that the only requisite to complete the transfer, was the acceptance of Dargan.”
Now what possible motive could Dargan have, to induce him to decline acceptance? He had been security for Long, and had paid money on account of it, and it would be a singular presumption .to infer, that he would he opposed to receiving back what he had expended. The presumption of the common law, indeed one of its maxims, if our memory be correct, is, that a man will not renounce that which is due for his benefit — a presumption verified in this instance by Dargan’s immediate assent, on the receipt of Long’s letter, to the transfer made in his behalf. From what point of time, then, under existing circumstances, shall this transfer of property from Long to Dargan, be considered as having taken place? From the date of the letter, or the receipt of it by Dargan? "We think that it should be referred back to the date of the letter. ■ It was then that Long, the owner of the property, transferred all his right and interest to Dar-gan, whose after acceptance consummated the efficacy of the transfer, at the time it was made. If a bill of sale, (as has been decided,) delivered to a stranger for the use ■ of a third person, is a valid transfer *405 from, tbe date of delivery, if tbe vendee accepts, by parity of reason, where a transfer of personal property is made by writing contained in a letter, if tbe person to whom tbe letter is addressed, accepts it, it shall have relation back to tbe date of tbe letter. As authority for tbe opinion, tbe Court refer to tbe case of Prime vs. Yates et at, decided at Charleston, which was this: Lockwood was in Charleston, and owner of tbe schooner Mary Ann. He was indebted to Prime, tbe plaintiff, who lived in New York. Blagge, tbe father-in-law of Lockwood, also resided in New York, and bad become security for Lockwood’s debt to Prime, Blagge addressed a letter to Lockwood, pressing to be relieved from bis responsibility. Lockwood executed a bill of sale to Blagge for tbe schooner, and inclosed it in a letter, addressed to Dr. Joseph Walden, of Charleston, on tbe 10th of April, 1808. On tbe same day, Lockwood wrote another letter to Blagge, informing him that be had left tbe bill of sale with Walden, for him. Lockwood immediately after put to sea in another vessel, and never returned. Blagge assigned bis interest in tbe schooner to- Prime, in tbe discharge of Lockwood’s debt. Walden, tbe day after be received tbe bill of sale, took possession of tbe vessel for Blagge, but bad received no letters or other powers from Blagge, constituting him bis agent. On tbe 14th of April, only four days after tbe date of tbe letter, and whilst tbe bill of sale remained in Walden’s possession, tbe defendants, Yates and others, creditors of Lockwood, levied their attachment. Judge Nott, who wrote tbe opinion of tbe *406 Court, said, that the transfer by Lockwood, amounted to a complete divestiture of the property; and that if the consent of Blagge was necessary, it must be presumed, from .all the circumstances of the case. The same principle is reiterated in Shubar and Bunting vs. Winding, (same book,) 218, where a debtor inclosed notes, etc., to one of his creditors, by letter, with directions to satisfy, first, his own debt, then those of other creditors, designated by name.
We are of opinion, then, that .the note that miscarried must share in the trust. This is just, as it respects both Kirkman & Luke, and Newell, Irvin & Co. If this be not allowed, how are Newell, Irvin & Co., protected'. They are certainly liable as indorsers-, and it was the intention of the assignment to protect them. That they are so liable, is not denied. No attempt was ever made, either by W. E. Newell & Co., or Newell, Irvin & Co., to revoke or countermand the delivery of the letter containing the note, if any such thing could have been done. And we do not see how it- could, after the mailing of the letter— certainly not after Kirkman & Luke had consented to receive the note as a security. The miscarriage of the letter and loss of the note do not change the case.
As to the decree in another aspect, we do not see how it can be' required of Kirkman & Luke, as a condition, that they pay Thomas Kirkman, before being let into the trust fund. It is clear, that Newell, Irvin & Co., who became indorsers for the accommodation of W. E. Newell & Co., with a view *407 to aid them in their business, and to sustain their credit, are liable to' Kirkman & Luke, the holders. The express object in making and indorsing the notes, was, that they should be passed to Kirkman & Luke, as collateral security for what W. E. Hewell & Co. owed them, or might owe them, etc.; and there can be no question as to the binding efficacy of the notes, upon the indorsers, as well as the -makers: Kimbra' vs. Sytle, 10 Yerg., 417.
This being so, the indemnity or collateral security created by W. E. Kewell & Co., inures to the benefit of Kirkman & Luke, in virtue of the legal effect of the deed, there being, in all such cases, a direct trust for the creditor, who is alone entitled to receive the money from the trustee — a payment to the indorser being unauthorized, unless, indeed, he, has made a payment on the debt, and then only so far as he has paid, can he receive: 3 Yer., 257, 277; 6 Hum., 313, 316. The effect of the assignment,- is to create a security for the debt, and he that owns the debt is the proper person to receive payment from the trust estate. The same rule, precisely, governs as to the debt held by Thomas Kirkman. On the other hand, it is but a common principle, that a collateral security taken by the creditor of the debtor, inures to the indemnity of the security or indorser, who has the right to insist that the fund shall be applied so as to disincumber him. It is a rule that the surety or indorser is entitled to have every remedy enforced which the creditor has against the principal; and he may apply to the Court for relief and protection ns soon as he is *408 endangered, even if he has not heen troubled or molested for the debt, a fortiori, if he has; and he may compel the creditor not only 'to sue the principal debtor, hut to use the requisite means to collect from him the debt. And it has heen held that a- surety has, in respect of his liability, so far the rights of a creditor, that, upon the insolvency of the princpal debtor, he may return any funds belonging to him in his hands: Williams vs. Helme et al., 1 Dev. Eq. R., 151. And upon the principle of the case of Williams vs. Love, Ex’r, et al., 2 Head., 80, a Court of Chancery would not compel a surety or indorser to part with funds in his hands in favor of a creditor, unless he would first indemnify him against his liabilh■•ties for him as surety and indorser; but the mere liability of an endorser, without any payment of the money, does not enable him, as owner, to sue antecedent parties to the paper, or to have set-offs allowed him against them; nor can he claim to have a trust fund, though created for his indemnity, diverted from the debt, and applied to his use. T© require Kirk-man & Luke, before they share in the trust, to pay Thomas Kirkman, is not only against the deed, but against the interest of Newell, Irvin & Co. It enlarges the fund for others, and leaves them still liable. Kirkman & Luke being the acceptors of the bills, are, to be sure, as to Newell, Irvin & Co., principals, but not so as to the drawers, the acceptances being for their accommodation. But what equity does this . create to so oust Kirkman & Luke ? The fund is that of the principal, and if sufficient to extinguish *409 bis entire indebtedness, could there be any doubt upon the case, and what difference does it make that there is not enough? The parties are before the Court, and we can make a complete decree — what are their equities ? Thomas Kirkman has a right to share in the trust fund, and the indorsers, (Newell, Irvin & Co.,) as well as Kirkman & Luke, may insist he shall. Furthermore, for any balance of his debt, he may have a personal decree against all the parties to the bills, and Newell, Irvin & Co. may require such a decree as to the drawers and acceptors. This decree may be satisfied out of the share of Kirkman & Luke in the trust fund, as it may from any other estate of theirs; (for by its application to what is due them, etc., it becomes their property;) and the fund being in custody of the Court, no execution is necessary to reach it, but it may be applied by decree. On the other hand, Kirkman & Luke are entitled, not only to share in the trust fund as to the four collateral notes, but for any balance may have a decree against the parties to the notes, including Newell, Irvin & Co.; but the latter may insist, that, to the extent of any balance due Thomas Kirkman, not satisfied by W. E. Newell & Co., or by the trust fund, or by Kirkman & Luke, the latter shall not have execution against them until they are first relieved from the liability they may be so under to Thomas Kirkman.
The decree will be reversed, and a decree entered in conformity to the principles of this opinion.
This cause was argued at a former term of this Court, before our predecessors, and continued under ad- *410 visemenfc by tbe Court during vacations. Tbe foregoing opinion was prepared by Judge Wright, and is now adopted as tbe opinion of tbis Court.
Judge Shackelfoed, dissenting.